**GEORGETOWN STEEL CORPORATION Plaintiff,**

v.

**UNION CARBIDE CORPORATION, Law Engineering Testing Co., and Pittsburgh Testing Laboratory, Inc., Defendants.**

**Civ. A. No. 2:85–0440–1.**

United States District Court, D. South Carolina, Charleston Division.

Nov. 6, 1992.

---

**12.** 46 U.S.C.A. § 31341 lists persons presumed to have authority to procure necessaries. *See su-* *pra* note 4 (text of 46 U.S.C.A. § 31341).

Patrick Michael Duffy, McNair Law Firm, Charleston, S.C., Edwin Russell Jeter, Charles S. Porter, Jr., McNair Law Firm, P.A., Columbia, S.C., James B. Moore, Jr., McNair Law Firm, P.A., Georgetown, S.C., Robert B. Wedge, Atlanta, Ga., for plaintiff.

Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, S.C., for defendant Union Carbide Corp.

Claron Atherton Robertson, III, Robertson & Sinkler, Charleston, S.C., Robert O. Fleming, Jr., Herman S. Clark, General Counsel, Atlanta, Ga., for defendant Law Engineering Test.

## ORDER

HAWKINS, Chief Judge.

This suit arose from foundation damage to a track scale, a truck scale, a refractory warehouse, and an oxygen separating plant located at the Georgetown Steel Corporation (GSC) plant in Georgetown, South Carolina. At GSC's request, Pittsburgh Testing Laboratory, Inc. (PTL) performed tests on steel slag, a by-product of the steel milling process, to determine if the steel slag had certain properties and characteristics that would permit its use as backfill material. Steel slag has expansive properties that were not revealed by the particular tests PTL was asked to perform. Slag was used as backfill under the track scale, the truck scale and the warehouse. Additionally, steel slag was used as backfill beneath an oxygen separation plant built by Union Carbide at a site on the premises of GSC.

GSC leased a site to Union Carbide (Carbide) to build an oxygen separation plant on GSC's steel mill premises so that GSC could obtain liquid oxygen and nitrogen at a lesser cost. The highly sensitive instruments of the oxygen separation plant have an extremely low tolerance for even minimal foundation movement from settlement. GSC contracted with Law Engineering Testing Company (Law) to perform engineering and soil testing services for the site preparation. Use of steel slag as backfill was approved by Law, though Law performed no tests on the slag to determine its suitability for such use.

After the plant was completed, the slag beneath the building began to swell and, eventually, the swelling rendered the oxygen plant useless and dangerous. The oxygen plant had to be closed down on May 5, 1985.

GSC filed suit against PTL for damage to the track scale, the truck scale and the

refractory warehouse and against both PTL and Law for damages sustained from the destruction of the oxygen separation plant. GSC sued PTL and Law on claims of negligence, and breach of express and implied warranties. GSC filed suit against Carbide for declaratory judgment to determine the rights of the respective parties.[1] Carbide cross-claimed against Law and PTL and counterclaimed against GSC. The case was tried to this court and that decision[2] was appealed to the Fourth Circuit Court of Appeals.

This court's order allowed GSC to recover for PTL's negligence only for the damage to the track scale. Having found that GSC should have been on notice regarding problems with the use of slag as backfill after the problems arose with the track scale, the district court found that GSC's contributory negligence barred recovery from PTL for the damage to the other buildings. The lower court further found PTL had breached its implied warranty to GSC but denied damages because use of the slag as backfill material to be placed under a particular structure was not foreseeable to PTL. The district court found no express warranty from PTL to GSC.

The trial court denied GSC's negligence and express and implied warranty causes of actions against Law upon a finding that the expansiveness of the slag did not fall within Law's scope of duties as defined in its agreements with GSC. Further, the lower court denied GSC's claims against PTL and Law. Lastly, all of Carbide's claims against Law were denied on the theory that GSC was Carbide's agent and that GSC's contributory negligence was imputed to Carbide.

The Fourth Circuit Court of Appeals affirmed[3] the finding of GSC's contributory negligence as to the claims against PTL. The court of appeals also affirmed the find-

ing that GSC could not recover from PTL for damages to any structure other than the track scale. The amount of damages due from PTL to GSC for backfill expansion under the track scale house has already been determined by the lower court to be $3,233 and judgment has been satisfied.[4]

However, the court of appeals held that Law was negligent in approving the use of slag for backfill without first testing it for suitability. The appellate court also found that GSC's failure to inform Law of the problems at the track scale did not rise to the level of contributory negligence, and further, that GSC was not contributorily negligent when it informed Law that slag had successfully been used as backfill in other operations at the plant. Additionally, the Fourth Circuit found that Law breached its warranty to GSC when Law rendered its opinion that slag would be suitable as a fill material without first testing the slag.

As to Carbide's claims against PTL, the court of appeals agreed that PTL had no duty to Carbide. However, as to the finding that an agency relationship existed between Carbide and GSC, imputing GSC's knowledge to Carbide and thus, precluding Carbide from recovering from Law, the appellate court held the finding to be clearly erroneous.

On remand this court must determine the amount of damages due to GSC for Law's negligence and breach of warranty, and must determine whether Law is liable to Carbide and, if so, the amount of damages resulting therefrom.

■ Law urges a finding that the limitation of liability and warranty provision, contained in the contract between Law and GSC, is an express warranty and limitation of liability for any professional negligence

---

1. GSC and Union Carbide informed the court that they had settled the matters between them. Pursuant thereto, an order of dismissal was entered July 6, 1988. Carbide assigned its claims against Law and PTL to GSC.

2. *Georgetown Steel Corporation v. Union Carbide Corporation, et al.,* CA No. 2:85–0440–1 (D.S.C. Nov. 28, 1988).

3. *Georgetown Steel Corporation v. Union Carbide Corporation, et al.,* 892 F.2d 1041 (4th Cir. 1989) (unpublished).

4. PTL is no longer a party to this suit.

in Law's performance of duties under the contract.

The relevant contractual provision reads:

*WARRANTY AND LIMITATION OF LIABILITY*—The only warranty or guarantee made by Law Engineering Testing Company in connection with the services performed hereunder, is that we will use that degree of care and skill ordinarily exercised under similar conditions by reputable members of our profession practicing in the same or similar locality. No other warranty, expressed or implied is made or intended by our proposal for consulting services or by our furnishing oral or written reports.

Our liability for any damage on account of any error, omission, or other professional negligence will be limited to a sum not to exceed $50,000 or our fee, whichever is greater. In the event the client does not wish to limit our professional liability to this sum, we agree to waive this limitation upon receiving client's written request, and agreement by the client to pay additional consideration of 4% of our total fee or $200.00 whichever is greater.

 Exculpatory clauses are not generally favored in the law and are strictly construed against the party seeking to enforce a limitation on its own negligence. *See, Pride v. Southern Bell Telephone and Telegraph Co.*, 244 S.C. 615, 138 S.E.2d 155, 157 (1964). However, in a contract between private parties of roughly equal bargaining power such limitations may be upheld. In the instant case, GSC is a business sophisticate. As this court has already noted,[5] it strains credulity for GSC to assert that it did not recognize the possible consequence of a limitation of liability clause, particularly since the clause provided a relatively simple and inexpensive manner by which Law was willing to forego the inclusion of the limitation on liability.

On February 8, 1980, Messrs. Nance and Blevins of Law submitted a proposal to GSC for providing geotechnical exploration for the proposed oxygen separation plant. The proposal requests that GSC make any necessary changes to the attached purchase order and further indicates that a "fee schedule" and "general conditions" are attached. The above quoted contractual provision is on the back of the page entitled "General Conditions".

The purchase order, dated February 12, 1980, contains interlineated changes initialled by WEK and WAJ (or WHJ)[6] on several pages. "W.E. King" signed the contract for GSC as the Director of Purchasing and "Wesley" (or "Westby") "Johnson" signed the contract on behalf of Law. Specifically, on page one of the purchase order, an interlineation that reads "and attached general conditions" is initialled by both King and Johnson.

GSC now argues that the general conditions page, which contains the limitation of liability and warranty clause, was not a part of the negotiated contract terms. Although the clause may not have been specifically or "expressly" negotiated, the above-referenced interlineation is strong evidence that GSC was made aware of the inclusion of the "general conditions" page as a part of the contract and that it acquiesced in its inclusion in the contract. Furthermore, the clause provides such a simplistic way for GSC to have shifted full liability to Law for any breach of warranty, express or implied, or professional negligence, that had GSC wanted to negotiate that term differently, the option to do so was provided right in the language of the limiting provision.

Although GSC asserts that the contract clause is ambiguous and as such must be construed against Law, the contested provision clearly and unambiguously sets forth the standard of care, the warranty disclaimer, and the limitation of liability to $50,000 in damages.

GSC avers that tort law does not limit the professional duty of care for engineers to a locality standard; therefore, the limitation clause of the contract is insufficient to

5. *Georgetown Steel Corporation v. Union Carbide Corporation, et al.,* CA No. 2:85–0440–1 (D.S.C. Nov. 28, 1988).

6. The middle initial is illegible.

limit Law's negligence in tort even if it limits liability for a breach of warranty. To support that proposition GSC cites to two South Carolina cases: *King v. Williams*, 276 S.C. 478, 279 S.E.2d 618 (1981) (abolishes the locality rule for the professional standard of care for physicians); and, *Folkens v. Hunt*, 290 S.C. 194, 348 S.E.2d 839 (Ct.App.1986) (holding the locality rule not applicable to accountants). However, both cases, which abolished a locality standard for certain professional groups in favor of a national standard of care, were decided after 1980, the year in which the contract in question was executed, and neither case cited refers specifically to any professional standard of care for engineers. Thus, this court is unpersuaded by GSC's argument on this point. Accordingly, this court finds that the limitation clause in the contract between Law and GSC is a valid limitation of Law's liability for its negligence and breach of warranties.

Since Law concedes that its fee was less than $50,000 and that GSC's damages exceed $50,000, the total recoverable damages to GSC from Law as limited by the contract are $50,000.

■ Next, the court must determine if Law has any liability to Carbide and if so, what is the amount of damages. Carbide asserts theories of negligence and of breach of implied warranty to support its contention that Law is liable to Carbide for damages.

Law and Carbide have no contractual relationship; nonetheless, Carbide claims that it relied on Law's professional services, even though those services were contracted for by GSC as a part of Carbide and GSC's contract, which required GSC to be responsible for site preparation for the oxygen separation plant. There was some evidence presented at the first trial that indicated Carbide personnel had contacted Law personnel and that Law was made aware of Carbide's concerns about foundation stability.

■ A cause of action for negligence is supported by evidence of three elements: (1) the existence of a duty on the part of the defendant to protect the plaintiff; (2) the failure of the defendant to discharge the duty; and, (3) injury to the plaintiff resulting from the defendant's failure to perform. *South Carolina State Ports Authority v. Booz–Allen & Hamilton, Inc.*, 289 S.C. 373, 346 S.E.2d 324 (1986). The initial question is whether Law owed a tort duty to Carbide.

Carbide relies on *South Carolina State Ports Authority v. Booz–Allen & Hamilton, Inc., Id.*, to support its argument that a consultant may owe a duty to a third-party who is injured by the contents of the consultant's report in certain circumstances. Carbide asserts that Law had a duty to Carbide as a third-party to the contractual relationship between Law and GSC.

The Supreme Court of South Carolina decided *Booz–Allen* on a certified question from the District of Columbia Court of Appeals. In *Booz–Allen*, a consulting firm under contract with the Georgia Ports Authority prepared a report which compared the Savannah port with the Charleston port for commercial traffic use. The Georgia Ports Authority intended to disseminate the report as a marketing device to promote the Savannah port; the consulting firm knew of the intended use of the report. The report contained false information regarding certain objective facts about the Charleston port facilities including facts such as channel depth. The South Carolina State Ports Authority had no input into the use of the information gathered by Booz–Allen & Hamilton, nor was it aware of the preparation or dissemination of the document until the South Carolina Ports Authority suffered damages from a loss of commercial traffic to the Charleston port.

The South Carolina Supreme Court held the consulting firm liable for damages to the State Ports Authority for the dissemination of false information regarding the Charleston port facilities.

We hold a duty to use due care, running from a consultant to the commercial competitor who is being critiqued, arises

when the consultant undertakes to objectively analyze and compare the attributes of commercial competitors for the purpose of giving one a market advantage over the other.

346 S.E.2d at 326. The *Booz–Allen* opinion is limited to a very narrow set of facts. The South Carolina Supreme Court decision that created the peculiar tort duty between a stranger to a contract and a consulting firm was not one concerned with elimination of the ties of privity of contract but of concern for the public purse.

Although counsel for Carbide argued that the facts of the case *sub judice* are more compelling than *Booz–Allen,* the contrary is true. Carbide is not nearly as sympathetic a party as the South Carolina State Ports Authority who had no knowledge of, or input into, the transaction between Booz–Allen & Hamilton and the Georgia Ports Authority. Unlike the South Carolina State Ports Authority, Carbide delegated the site preparation work to GSC by contract and relied on GSC to obtain accurate and reliable geophysical data for site preparation. GSC had a duty to Carbide to uphold its end of that bargain and GSC chose to contract with Law for site preparation services.

All parties in the instant action contracted at arms length. All parties are private commercial entities with vast resources to conduct, or to have conducted, whatever tests were deemed commercially reasonably necessary under the circumstances. None are unsophisticated consumers and none were innocent bystanders to the transactions relevant to this suit. Each had well-defined responsibilities in its role in the construction of the oxygen separation plant. As succinctly stated in the *Booz–Allen* opinion, "[t]he concept of duty in tort liability must not be extended beyond reasonable limits." *South Carolina State Ports Authority v. Booz–Allen & Hamilton, Inc., supra,* 346 S.E.2d at 326 (citation omitted). Though Law may have been negligent in the performance of its duties to GSC, Law had no tort duty to Carbide arising from its independent contractual relationship with GSC.

Carbide has argued that *Hill v. Polar Pantries,* 219 S.C. 263, 64 S.E.2d 885 (1951) and *Kennedy v. Columbia Lumber & Manufacturing Co.,* 299 S.C. 335, 384 S.E.2d 730 (1989) support the argument that Law breached an implied warranty to Carbide. Carbide's reliance on these cases in this context, however, is misplaced for several reasons.

Briefly, *Hill* involved the installation of a frozen food locker. The defendant in that case had contracted with the plaintiff to design the refrigerator, supply the materials, construct the facility and provide the necessary training to the plaintiff's employees for the operation of the food locker. *Hill,* 64 S.E.2d at 886. The food locker failed to operate as warranted. The court in *Hill* found that

> where 'a person holds himself out as specially qualified to perform work of a particular character, there is an implied warranty that the work which he undertakes shall be of proper workmanship and reasonable fitness for its intended use, and, if a party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purpose in view.' ... These principles have been applied to building contracts.

*Id.* at 888 (citations omitted). The *Hill* fact scenario is similar to the Law/GSC relationship; although, Law expressly limited its liability to GSC for a breach of implied warranty.

*Kennedy* was a breach of implied warranty case involving defects which were subsequently found after the sale of a new home. The *Kennedy* court rejected the opinion of the South Carolina Court of Appeals in *Carolina Winds Owners' Association, Inc. v. Joe Harden Builder, Inc.,* 297 S.C. 74, 374 S.E.2d 897 (Ct.App.1988), in which the appellate court had held that the source of the implied warranty of habitability was the *sale* of the house. The *Kennedy* court prefaced its discussion of *Carolina Winds* by stating "[w]hile the Court of Appeal's reasoning appears to be a seamless web of proper legal analysis, the opinion reaches a result which is repugnant

to the South Carolina policy of protecting the new home buyer." *Id.* 384 S.E.2d at 734.

The court then went on to discuss the decline of the rule of *caveat emptor.* Finally, the court discussed the concomitant decline of the concept of privity as a defense to an implied warranty action in the sale of a new home. *Id.* at 736. In its discussion of implied warranty, the court noted that there is an implied warranty of workmanlike service when a builder contracts to build a house. *Id.* For this proposition, the court cited to *Hill,* 64 S.E.2d 885 and *JKT Co. v. Hardwick,* 274 S.C. 413, 265 S.E.2d 510 (1980).

Carbide's argument herein is premised on the "implied warranty of workmanlike service" statement in *Hill* and *Kennedy.* For several reasons, this court does not interpret these cases so broadly.

■ First, as a general proposition, an action for breach of an implied warranty does not extend to contracts for professional services. *See, e.g., Queensbury Union Free School Dist. v. Jim Walter Corp.,* 91 Misc.2d 804, 398 N.Y.S.2d 832, 834–35 (N.Y.Sup.1977) (citations therein). Those few cases that have recognized such an action have done so only in the limited situation where the professional or personal service involves the repair or modification of a tangible good. *See e.g., Archibald v. Act III Arabians,* 755 S.W.2d 84 (Tex.1988) (professional horse trainer modifies a horse, which is a tangible good).

■ The latter theory of modification and repair appears to have been at the heart of the decision in *Hill,* which limited itself to building contracts. *See Hill,* 64 S.E.2d at 888; *Hutson v. Cummins Carolinas, Inc.,* 280 S.C. 552, 314 S.E.2d 19, 23 (S.C.App.1984). Beyond the *Hill* case, South Carolina has recognized such an action only in the cases of builders, architects and the new home buyer. *See Beachwalk Villas Condominium Assoc. v. Martin,* 305 S.C. 144, 406 S.E.2d 372, 374 (1991). Thus, a limited warranty cause of action for professional services is the exception rather than the rule in South Carolina. Even if the court was persuaded that ex-

tending limited warranty liability to professional services was warranted, which it is not, Carbide would still not have an action against Law because an architect, whose work represents the actual modifications to be made to the property, can be distinguished from an engineering consultant such as Law, whose work product only opines as to the suitability of various types of materials which may or may not be used in the modification process.

Second, *Kennedy* was specifically based on the South Carolina public policy of protecting the new home buyer. As stated above, the courts in South Carolina have only extended limited warranty liability to professional services when the injured party is unexperienced and in complete reliance on the expertise of the service provider, as is the case between a new home buyer and the builder or the architect. *See, e.g., Kennedy,* 384 S.E.2d at 736. The facts of this case, however, are readily distinguishable from the purchase of a new home. Thus, while the public policy of protecting the new home buyer may justify the imposition of *caveat venditor,* there is no indication that the Supreme Court of South Carolina intended the same rule to apply to this case, which involves an arms-length transaction between commercial sophisticates in a highly technical field.

Finally, and in a similar vein, the court is hesitant to totally discard the concept of privity in a case that involves commercial sophisticates. As stated above, the South Carolina courts have willingly cast aside the defense of lack of privity in the context of a sale of defective construction materials, *JKT Company, Inc. v. Hardwick,* 274 S.C. 413, 265 S.E.2d 510 (1980), and in the case of defective workmanship in a new home. *Beachwalk Villas,* 406 S.E.2d 372. Nonetheless, the court has been unable to find any case that suggests that the defense of lack of privity is not viable in the context of a professional services contract. This is particularly true in this case where the parties have their own field of engineers and at least some measure of competency in performing the very tests which Law contracted to perform. Given the spe-

cific circumstances in which limited warranty liability has been imposed on parties not in privity with one another as well as the limited extent to which limited warranty liability has been recognized in the context of professional services contracts, Carbide's reliance on *Kennedy* and *Hill* as a basis for an action for breach of a limited warranty is misplaced.

■ A similar line of reasoning undermines Carbide's claim that Law breached an express warranty to them. Carbide cites to *Burns v. Wannamaker*, 281 S.C. 352, 315 S.E.2d 179, 181 (S.C.App.1984) *modified on other grounds*, 288 S.C. 398, 343 S.E.2d 27 (1986) in support of their argument. Yet, *Wannamaker* held only that a dentist "should be as free as any other person to offer to perform skilled services to contract as he sees fit. If a dentist chooses, he should be able to warrant the results of his treatment." *Id.* Law, however, did not contract with Carbide and there is no indication that the Supreme Court of South Carolina has relaxed the concept of privity in a case where the professional must specifically contract with a party to create the express warranty. *See Roundtree Villas Assoc., Inc. v. 4701 Kings Corp.*, 282 S.C. 415, 321 S.E.2d 46, 51 (1984) (lender not liable for faulty construction of builder). Therefore, Carbide's claim for breach of an express warranty is without merit.

Accordingly, this court finds that Law is liable for its negligence in the performance of its duty to GSC and for its breach of warranty to GSC. Further, the court finds that GSC is due damages from Law for Law's negligence and breach of warranties in the total amount of Fifty Thousand Dollars, as limited by the contract between Law and GSC. Further, the court finds that Law is not liable to Carbide for negligence or breach of any implied or express warranty.

IT IS SO ORDERED.